# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

FUNTANA VILLAGE, INC.,
ET AL.,

       *Plaintiffs*,

**v.**                              Case No. 5:15cv282-MW/GRJ

THE CITY OF PANAMA CITY
BEACH,

       *Defendant*.

_____/

## <u>ORDER DENYING PRELIMINARY INJUNCTION</u>

## I.   INTRODUCTION

This case concerns the legality of a number of ordinances passed by Defendant, the City of Panama City Beach ("City"), to combat what it perceived to be an increasingly out-of-control atmosphere during Spring Break.[1] Plaintiffs—a number of businesses that cater to Spring Breakers and eight John and Jane Doe

---

[1] Spring Break in Panama City Beach is a yearly happening—to call it an event or a festival would imply a degree of coordination or organization that is largely missing—during which hundreds of thousands of college students (and others) flock to the City for alcohol-fueled fun. There is much partying. *See, e.g.*, Sanika Dange, *The History of Spring Break*, WJHG.com (Apr. 29, 2014), http://www.wjhg.com/home/headlines/The-History-of-Spring-Break-257 129781.html.

Spring Breakers—seek a preliminary injunction to prevent the enforcement of these ordinances.[2] ECF No. 21. The City opposes the motion. ECF No. 50.

### A. The Spring Break Ordinances

There are a number of ordinances at issue. The challenged ordinances will collectively be referred to as the "Spring Break Ordinances."

Ordinance 1347 limits the hours during which alcoholic beverages can be "sold, consumed or served" in a licensed establishment during the month of March. ECF No. 4-4, at 3. During the rest of the year, alcohol can be sold, consumed, or served in a licensed establishment between the hours of 7:00 a.m. and 4:00 a.m. the next day, and beer and wine can be sold at any time "provided such sale is for off-premises consumption only." *Id.* During March, however, alcohol can only be sold, consumed, or served in a licensed establishment between 7:00 a.m. and 2:00 a.m. the next day. *Id.* Each year, the City Council may extend the period during

---

[2] Although the business Plaintiffs and the John and Jane Doe Plaintiffs have different legal interests and do not all possess standing to bring each and every claim, for simplicity's sake they will collectively be referred to throughout as "Plaintiffs."

2

which the 2:00 a.m. cutoff applies by resolution, provided that res-olution is made by January 31. *Id.* Under state law, an establish-ment with an alcoholic beverage license cannot "allow the licensed premises . . . to be rented, leased, or otherwise used during the hours in which the sale of alcoholic beverages is prohibited" by lo-cal ordinance. § 562.14(2), Fla. Stat. (2015). Ordinance 1347 there-fore forces licensed establishments to close two hours earlier dur-ing March. Ordinance 1347 will be referred to as the "hours-of-op-eration" ordinance.

Ordinance 1348 prohibits the possession or consumption of alcoholic beverages in a commercial parking lot "unless the park-ing lot is concurrently under surveillance and control by the asso-ciated business or commercial use." ECF No. 4-5, at 3.

Ordinance 1349 prohibits vehicles from being parked "on an unmarked or unpaved portion of any right of way of any Scenic Corridor in the City after dark." ECF No. 4-6, at 2. "After dark" is defined to mean "from one-half hour after sunset until one-half hour before sunrise as established by the times listed in any local publication or governmental website."[3] *Id.*

---

[3] The City has passed a new ordinance replacing Ordinance 1349, Ordi-nance 1377, clarifying the definition of "after dark."

Ordinance 1353 bans the possession or consumption of alcoholic beverages on the beach during March. ECF No. 4-7, at 3–4. Each year, the City Council may extend the period during which the ban applies by resolution, provided that resolution is made by January 31. *Id.* at 3. This ordinance will be referred to as the "beach-drinking ordinance."

Ordinance 1355 increases the fines for violating the City's laws banning alcohol possession in parking lots and rights-of-way. ECF No. 4-8, at 2–3.

### B. The Claims at Issue

Plaintiffs' First Amended Complaint, ECF No. 16, contains fifteen counts, while their preliminary injunction motion only seeks an injunction based on twelve of those counts. ECF No. 21, at 2. This Court dismissed one of these counts, ECF No. 63, and Plaintiffs indicated at the hearing held on the preliminary injunction motion that they are not seeking an injunction based on a number of the other counts. In particular, Plaintiffs no longer seek preliminary injunctive relief based on Counts I, II, and VIII of the First Amended Complaint.

The remaining claims are (1) a First Amendment challenge to the hours-of-operation and beach-drinking ordinances (Counts

III and VI); (2) a Dormant Commerce Clause challenge to the Spring Break Ordinances (Count IV); (3) an Equal Protection challenge to the Spring Break Ordinances (Count V); and (4) state-law land-use-planning challenges to the beach-drinking ordinance (Counts XI–XIV). The merits of these four challenges will be addressed *infra* Part III.

"At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir.1986)).  In so stating, it is important to note that some of the evidence presented in support of the motion for preliminary injunction may not be properly considered on summary judgment or admissible at trial.

## II.    PRELIMINARY INJUNCTION STANDARD

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs

whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quotation omitted).

## III.   LIKELIHOOD OF SUCCESS ON THE MERITS

### A. First Amendment

Plaintiffs challenge the hours-of-operation ordinance and the beach-drinking ordinance on First Amendment grounds. Plaintiffs lasso the ordinances and bring them into the contours of the First Amendment by characterizing the sale and service of alcohol as being "inextricably intertwined" with First-Amendment-protected entertainment hosted at Plaintiffs' venues. ECF No. 16, at 7 ¶ 33. The hours-of-operation and beach-drinking ordinances infringe on Plaintiffs' ability to present this entertainment. *Id.* at 41–42 ¶¶ 183–91. The City argues that these ordinances are not even restrictions on speech at all, but are rather exercises of its Twenty-first Amendment power to regulate alcohol. ECF No. 26, at 3–7.

6

A reasonable First Amendment jurisprudence might support the City's view, but the last few years have taught us that there is nothing that cannot be characterized as speech, if one only has the will to do so. *See, e.g.*, *Dana's R.R. Supply v. Att'y Gen. of the State of Fla.*, 807 F.3d 1235 (11th Cir. 2015). Because the First Amendment looms over everything like some anti-regulatory Death Star (in Republic clothing), threatening to strike at any moment, this Court will assume that the ordinances are in fact speech restrictions to be analyzed using the First Amendment framework.

### 1.     Content-Neutral or Content-Based?

Plaintiffs claim that the ordinances are content-based. ECF No. 37, at 17. Clearly they are not, on their face, content-based. But even a law content-neutral on its face may be deemed content-based if it was enacted with the intent to suppress certain speech with which the government disagrees. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "[L]aws that cannot be 'justified without reference to the content of the regulated speech'" are deemed content-based and subject to strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (quoting *Ward*, 491 U.S. at 791).

The beach-drinking and hours-of-operation ordinances can clearly be, and in fact were, "justified without reference to the content" of the entertainment offered at Plaintiffs' establishments. While it is true that certain comments by Bay County Sheriff Frank McKeithen, Mayor Gayle Oberst, and others suggest that there was special concern over rap music, even those comments, taken in context, seem to evince a primary concern not with the content of the music itself, but with the "element" that music supposedly attracted. *Compare City of Renton v. Playtime Theatres*, 475 U.S. 41, 48 (1986) (zoning ordinance held to be content-neutral because predominant intent of legislators was "to prevent crime, protect the city's retail trade," etc., "not to suppress the expression of unpopular views"). And at any rate, there is not sufficient evidence to impute those comments to the City Council as a whole.

Even taking those comments into account, it is clear from the record as a whole[4] and from the "WHEREAS" clauses[5] of the

---

[4] The record is teeming with evidence of the anti-crime and pro-public safety purposes of the ordinances—so much so that an exhaustive citation to all such evidence in the record would be wasteful and unproductive. Some good starting points are as follows: ECF No. 49-5, at 3–8; ECF No. 49-14, at 4–9; ECF No. 49-15, at 5–6; ECF No. 49-32, at 4–5 ¶¶ 24–29, 6 ¶¶ 35–37.

[5] Such clauses are not determinative of legislative intent, but they are certainly evidence of such intent. *See, e.g.*, *Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1253 (11th Cir. 2003).

ordinances that their purpose was to help prevent crime, etc., not shut out a particular type of music or performer. Certainly it is theoretically possible for Plaintiffs to uncover evidence that the City Council adopted the ordinances to suppress a certain type of music, but it is not likely. As such, Plaintiffs are unlikely to be able to show that the ordinances are content-based.

### 2. *Reasonable Time, Place, and Manner*

Given that the ordinances are content-neutral, they will be upheld if they are "narrowly tailored to serve a significant governmental interest, and . . . leave[] open ample alternative channels for communication of the information" Plaintiffs seek to convey. *Buehrle v. City of Key West*, – F.3d –, 2015 WL 9487716, *4 (11th Cir. Dec. 29, 2015). The City correctly points out that its interests in "protecting public welfare and reducing criminal behavior" are significant. ECF No. 26, at 11. The only issues are whether (1) the ordinances are narrowly tailored to serve those interests and (2) whether the ordinances leave open enough alternative channels for the artistic expression that takes place at Plaintiffs' premises.

The ordinances are narrowly tailored. "[T]o meet the narrow tailoring requirement, the ordinance[s] 'need not be the least restrictive or least intrusive means of [serving the City's interests].

Rather, the requirement of narrow tailoring is satisfied so long as the [ordinances] . . . promote[] a substantial government interest which would be achieved less effectively absent the regulation.'" *One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1287 (11th Cir. 1999) (quoting *Ward*, 491 U.S. at 799). The ordinances meet this hurdle, as they will help reduce crime and ease the burden on law enforcement compared to the old laws (*i.e.*, 4 a.m. closing time and drinking on the beach allowed). ECF No. 49-32, at 3–5 ¶¶ 20–29; 6 ¶¶ 35–37.

While it is certainly possible to conceive of less speech-restrictive alternatives, most of them probably wouldn't serve the City's interests as well as the ordinances. Allowing establishments presenting entertainment to serve alcohol until 4.a.m. while forcing other establishments to close at 2 a.m. might in effect create two giant "let outs" and double the opportunities for the unruly behavior associated with mass migration of Spring Breakers from bar to hotel. *See id.* at 3–5 ¶¶ 20–29. Or it might lead to an over-concentration of people at the entertainment-presenting establishments, leading to the exact same problems at 4 a.m. that the City has had in the past. Similarly, allowing drinking on the beach at Plaintiffs' establishments while banning it elsewhere might have

the effect of channeling—and perhaps even exacerbating—the unruly behavior associated with beach drinking. *See* ECF No. 49-12, at 11 (discussion at Board of Commissioners/City Council joint workshop included observation that "90% of problems were behind clubs and establishments serving alcohol"); ECF No. 49-14, at 11 (considering alternative ordinance that would "[p]rohibit possession or consumption of alcohol behind clubs with history of crowds on the beach" but that would "permit possession of small quantities of alcohol for personal consumption" elsewhere on the beach).

The ordinances also leave open ample alternative channels of communication for Plaintiffs. Of course Plaintiffs will not be able to present the entertainment they wish to present in the form they wish to present it after 2 a.m. each March, but they will still be able to present that entertainment before 2 a.m. There is some evidence that Plaintiffs' establishments start "filling up" around 9 p.m. every night. ECF No. 49-5, at 4. Were closing time midnight, the impairment on speech would of course be more substantial, the alternative channels less ample, and the question closer. But because "[t]he Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative chan-

nels of communication unless the government enactment will fore-close an entire medium of public expression across the landscape of a particular community or setting," *Colacurcio v. City of Kent*, 163 F.3d 545, 555 (9th Cir. 1998), the many hours remaining during which Plaintiffs can present entertainment during Spring Break likely render the ordinances constitutional. Plaintiffs are unlikely to succeed in showing that the beach-drinking and hours-of-operation ordinances are not reasonable time, place, and manner restrictions.

### 3. Pre-Enactment Evidence

Plaintiffs next argue that the City passed the relevant ordinances without sufficient pre-enactment evidence. *E.g.*, ECF No. 37, at 22.

It is true that otherwise-permissible content-neutral time, place, and manner restrictions on speech will be struck down if the government cannot "demonstrate that it had a reasonable basis for believing that its regulation would further [its] legitimate interests." *Buehrle*, 2015 WL 9487716, at *4. The City's burden in this regard "is not a rigorous one." *Id.* The City must have relied "'on at least *some* pre-enactment evidence' that the [ordinances] would serve [their] asserted interests." *Id.* (quoting *Peek-A-Boo Lounge of*

12

*Bradenton, Inc. v. Manatee Cnty.*, 337 F.3d 1251, 1268 (11th Cir.2003)). "Such evidence can include anything 'reasonably believed to be relevant—including a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion.'" *Id.* (quoting *Peek-A-Boo Lounge*, 337 F.3d at 1268).

In this case, the City clearly had pre-enactment evidence that limiting the hours during which alcohol could be consumed and eliminating drinking on the beach would help combat some of the crime problems it was trying to solve. The City tried the early closing in 2015, and while there were certainly many who felt that it had not made a difference, *see, e.g.*, ECF No. 49-13, at 6–7, there were others—including law enforcement officials—who felt that it had helped. Panama City Beach Chief of Police Drew Whitman, for instance, described the early closings as "working" and "working great" during two meetings held in late March of 2015. ECF No. 49-8, at 9–10; ECF No. 49-10, at 3. In short, the City tried an experiment to help deal with a non-speech-related problem, received feedback from the Chief of Police that the experiment had worked, and then implemented the change on a permanent basis. This meets the low standard for pre-enactment evidence.

13

There was admittedly less pre-enactment evidence to support the beach-drinking ordinance,[6] but there was still enough for the City to have a "reasonable basis" for believing limiting drinking on the beach would help it address legitimate problems. The City Council rejected the idea of banning alcohol from the beach during a post-Spring Break meeting in 2014, ECF No. 49-3, at 9, but did discuss at length a proposal to ban coolers on the beach to combat "unruly behavior" and make it harder for criminals to find easy targets, *id.* at 9–10. Chief Whitman endorsed this idea. *Id.* The Council was also informed at that same meeting that the Bay County Board of County Commissioners had endorsed Sheriff McKeithen's suggestion to ban all alcohol from the beach during Spring Break. *Id.* at 10. Later, during an emergency meeting in

---

[6] To even call the beach-drinking ordinance—by itself, not in conjunction with the hours-of-operation ordinance—a "time, place, and manner" restriction on speech is a stretch. Still, as discussed *supra*, there's no telling the potential reach of First Amendment, so this Court will treat it as speech. But as an alternative basis for holding that Plaintiffs are unlikely to succeed on their First Amendment challenge to the beach-drinking ordinance, this Court finds that the ordinance does not even implicate First Amendment concerns in such a way that it need be analyzed under that framework. The beach-drinking ordinance, because it does not target Plaintiffs' establishments but instead applies everywhere on the beach, is subject to rational-basis review as a simple regulation of conduct. *See Foxxxy Ladyz Adult World, Inc. v. Vill. of Dix*, 779 F.3d 706, 719–20 (7th Cir. 2015). The beach-drinking ordinance passes muster under this test. *Cf. id.*

the middle of Spring Break 2015, the Board of County Commissioners actually *did* ban alcohol consumption on the portion of the beach within its jurisdiction, and the City soon followed. ECF No. 49-11, at 2. All this together would have given the City a reasonable basis for thinking that banning alcohol on the beach altogether might help combat crime and the other non-speech-related problems it wanted to address.

More importantly, though, the requirement for pre-enactment evidence does not preclude governments from "rely[ing] on 'their own wisdom and common sense.'" *Flanigan Enters., Inc. v. Fulton Cnty.*, 596 F.3d 1265, 1278–79 (11th Cir. 2010). In other words, while the government cannot infringe on speech through a time, place, and manner restriction based on *speculation* that the restriction will serve legitimate ends, when common sense clearly shows that the restriction will serve those ends that common sense can constitute "evidence." Such is the case here—the government was entitled to rely on the eminently sensible idea that banning drinking on the beach would lead to fewer alcohol-related injuries, less violence, etc.

*4.        As-Applied Challenge*

Plaintiffs claimed at the hearing that they are bringing an "as-applied" challenge to the beach-drinking and hours-of-operation ordinances—this appeared to be news to the City at the hearing. The gist of Plaintiffs' argument in this regard is that, while the ordinances might be fine when applied to other businesses, Plaintiffs' "business model" makes them especially sensitive to the effect of the ordinances.

To put it kindly, Plaintiffs are confused. A law such as the hours-of-operation ordinance will of course affect speech to differing degrees in different corners of the regulated community. For instance, a bar with a tradition of having a band come in and cover the Matchbox 20 song "3 A.M." every day at 3 a.m. will feel more of a First Amendment pinch than a bar that never hosts music. But when the "3 A.M." bar comes to court to challenge the ordinance, the existence of the other bars—and the non-speech-related evils to which they contribute and that the ordinance is designed to address—do not drop out of the First Amendment analysis. As one judge put it, "a time, place, and manner regulation is not unconstitutional simply because some alternative regulation would, *on the facts of the case before the court*, satisfy the government's

16

aims equally well and yet not restrict the expressive rights of that particular challenger." *White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518, 1544 (D.C. Cir. 1984) (Wald, J., concurring in the judgment in part and dissenting in part).

Consider in this regard *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984). *Clark* concerned a "no-camping" regulation covering Lafayette Park and the Mall in Washington, D.C. 468 U.S. at 290–92. The plaintiffs wished to sleep overnight—to therefore "camp" within the meaning of the regulation—in order to demonstrate "the plight of the homeless." *Id.* at 291–92. They claimed that the no-camping regulation, *as applied to them*, violated the First Amendment. *Id.* The Supreme Court upheld the no-camping regulation as a reasonable time, place, and manner restriction on speech. *Id.* at 296–98. The Court noted that

> "the validity of this regulation need not be judged solely by reference to the demonstration at hand. . . . Absent the prohibition on sleeping, there would be other groups who would demand permission to deliver an asserted message by camping in Lafayette Park. Some of them would surely have as credible a claim in this regard as do[] [the plaintiffs], and the denial of permits to still others would present difficult problems . . . . With the prohibition, however, as is evident in the case before us, at least some around-the-clock demonstrations lasting for days on end will not materialize,

17

> others will be limited in size and duration, and the
> purposes of the regulation will thus be materially
> served."

*Id.* at 296–97. The Court thus acknowledged that even in an "as-applied" challenge to a time, place, and manner restriction, the analysis should not just focus on the tailoring, alternative channels, etc. solely as they relate to the plaintiff, but should also take into account the restriction as a whole.

This is not to say that an as-applied challenge to a time, place, and manner restriction is *necessarily* identical to a facial challenge. It may be that the fact situation in the as-applied challenge is so remote from the "core fact situation intended to be covered by" the restriction that the as-applied challenge requires a new analysis of tailoring, etc. *See McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004). For instance, a band using excessive volume as part of its artistic message[7] might be able to successfully mount an as-applied challenge to a noise ordinance, whereas a run-of-the-mill rock band seeking to use excessive volume for no particular

---

[7] As an example, the band My Bloody Valentine, known for its very loud live shows, has been described as a group that "explores the art of volume." Karen Schoemer, *Pop & Jazz in Review*, N.Y. Times, Mar. 5, 1992, http://www.nytimes.com/1992/03/05/arts/pop-and-jazz-in-review-466692.html.

artistic purpose would have a hard time distinguishing its as-applied challenge from a (sure-to-be-unsuccessful) facial challenge. Here, though, Plaintiffs are not doing anything extraordinary, and they cannot argue "that they are involved in a different type of fact situation[] from the ones on the basis of which the [ordinances] w[ere] already upheld facially." *Id.* Therefore, for the same reasons Plaintiffs are unlikely to succeed in showing that the hours-of-operation ordinance and the beach-drinking ordinance are facially invalid, they are unlikely to succeed on their as-applied challenge.

## B. Dormant Commerce Clause

Plaintiffs bring a creative[8] challenge to the Spring Break Ordinances under the so-called Dormant Commerce Clause. ECF No. 16, at 43–44 ¶¶ 192–99. The gist of Plaintiffs' theory is that the City is attempting to interfere and/or will interfere with interstate commerce by discouraging people from coming to Panama City Beach for Spring Break. ECF No. 21, at 5 ¶ 6. This Court denied the City's motion to dismiss Plaintiffs' Dormant Commerce Clause claim, ECF No. 63, and there is no need to rehash the reasoning

---

[8] This was Plaintiffs' counsel's characterization of this claim at the preliminary injunction hearing.

behind that ruling here. For purposes of this Order, the key question is whether the Spring Break Ordinances are "discriminatory" within the meaning of the Dormant Commerce Clause.

### 1.   Discriminatory?

Economic protectionism—"regulatory measures designed to benefit in-state [or local] economic interests by burdening out-of-state [or non-local] competitors," *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273 (1988)—is "the core concern of the [D]ormant [C]ommerce [C]lause," *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 449 (6th Cir. 2009). Such protectionism is usually accomplished through discriminatory laws that treat out-of-state or non-local commerce differently than similarly-situated in-state or local commerce. A law can discriminate against interstate commerce "on its face, in its purpose, or in its practical effect." *Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013). A discriminatory law is invalid unless the government can "demonstrate both that the [law] 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).

Even a discriminatory law directed towards an ultimate purpose other than economic protectionism is subject to this exacting scrutiny. For instance, in *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), the Supreme Court struck down a New Jersey statute banning the importation of almost all waste generated or collected outside the state. In response to the argument that the statute was not intended as an economic protectionist measure, but rather as a measure to protect the health and safety of New Jersey citizens, the Court stated:

> "[T]he evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim of [the statute] is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently."

437 U.S. at 626–27.

In this case, the Spring Break Ordinances are not discriminatory on their face, nor do they seem to implicate the kind of protectionism that the Dormant Commerce Clause is meant to address. But they're clearly targeted at keeping certain people out of the City—at the very least, the "uninvited guests" or "predators" who the City feels are responsible for much of the crime during Spring Break. There's some evidence that the ordinances are even intended to keep out many of the "good kids," and to reduce the size of Spring Break altogether.[9] Such an aim seems at least in tension with the underlying premise of the Dormant Commerce Clause: that states (and political subdivisions thereof) may not "imped[e] free private trade in the national marketplace" in a significant way. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 436–37 (1980).

But there are two reasons why the Spring Break Ordinances are not "discriminatory" within the meaning of the Dormant Com-

---

[9] The evidence supporting this is relatively weak; it appears that the main aim of the relevant decisionmakers was to keep out a certain "element," not all Spring Breakers. Still, there is evidence that some in the community—including some politicians—wanted to reduce the size of Spring Break altogether. *See, e.g.*, John Murgatroyd et al., *Panama City gang rape: 'Spring break as we know it is over'*, CNN.com (Apr. 16, 2015), http://www.cnn.com/2015/04/15/us/florida-panama-city-beach-spring-break/ (quoting Bay County Commissioner Mike Thomas as saying "we're going to make spring break smaller").

merce Clause. First, they treat visitors to the City and locals precisely the same during the month of March. Second, to the extent that the ordinances *do* give preferential treatment to locals by relaxing certain restrictions during the rest of the year, they are not discriminatory because the only adverse effect is on Spring Breakers, not non-locals as a whole.

The Spring Break ordinances apply equally to locals and non-locals during the month of March. This is in sharp contrast to other cases (and there are not many) involving a state or local government's attempt to discourage tourism or travel. For instance, in *Florida State Conference of NAACP Branches v. City of Daytona Beach*, 54 F. Supp. 2d 1283 (M.D. Fla. 1999), the City of Daytona Beach—in an apparent attempt to discourage an annual reunion of alumni of historically black colleges from occurring in their city—instituted a traffic management plan that "call[ed] for all six bridges leading to . . . Daytona Beach . . . to be blocked to vehicular traffic during specified periods of congestion and gridlock." 54 F. Supp. 2d at 1285. The plan further provided that "certain individuals w[ould] be given passes to drive their vehicles across certain bridges and into Daytona Beach, even while others [we]re not al-

lowed entrance in their vehicles. . . . The excepted individuals include[d] Daytona Beach residents, business owners and employees, and registered hotel guests. . . . All others [would] be forced to park their cars in lots and take shuttles to cross the bridges into Daytona Beach, to walk to such destination, or to await entrance over the bridges in their vehicles at such time as they are allowed to enter in the discretion of the authorities." *Id.*

The court found that Daytona Beach had violated the Dormant Commerce Clause by "giving preferences in access to [the] City to residents over non-residents." *Id.* at 1287. This result makes sense from a "protectionist" view of the Dormant Commerce Clause, once "protectionism" is understood to encompass protection of local *consumers* as well as local producers. *See* Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1140–42 (1986) (discussing how protection of local consumers implicates the Dormant Commerce Clause). In this case, in contrast, Panama City Beach locals cannot drink on the beach during March, and cannot stay out at a bar until 4 a.m.—they are on equal footing with Spring Breakers.

Still, there's a limited sense in which the Spring Break Ordinances *do* favor locals over Spring Breakers. Because the hours-of-operation and beach-drinking ordinances are only in effect during Spring Break, a full-time resident has eleven months out of the year during which to enjoy beach-drinking and late-night libating, while a Spring Breaker cannot enjoy these activities at all. This treatment is not discriminatory, however, within the meaning of the Dormant Commerce Clause, because the Spring Breaker and the local enjoying beach-drinking or late-night libating during the rest of the year are not "competing" with each other—that is, they are not similarly-situated, and "any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). Those visitors who come to the City during the rest of the year and who do "compete" with locals are treated exactly the same as those locals, just as Spring Breakers are treated exactly the same as locals while they're in town.[10]

---

[10] Additionally, even if one considers the access to beach-drinking, etc. that a local enjoys to be different from that enjoyed by a Spring Breaker, that difference is due to the fact that the Spring Breaker is a *Spring Breaker*, not to the fact that he or she is a non-local. But "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978).

2.     Pike *Balancing*

Plaintiffs have not convinced this Court—and are very un-likely to convince this Court in the future—that the Spring Break Ordinances "discriminate" within the meaning of the Dormant Commerce Clause. This leads to two questions. First, should a non-discriminatory law regulating the sale or consumption of alcohol be automatically deemed valid under the Twenty-first Amend-ment? Second, if not, do "the [Spring Break] [O]rdinance[s] im-pose[] a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits?'" *See C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This second question is the inquiry at the heart of so-called *Pike* balancing.

There is a strong argument to be made that the Spring Break Ordinances—including the hours-of-operation and beach-drinking ordinances—should be automatically valid if they are not discrim-inatory. *See Lebamoff Enters., Inc. v. Huskey*, 666 F.3d 455, 466–68 (7th Cir. 2012) (Hamilton, J., concurring in the judgment) (tak-ing the position that *Pike* balancing does not apply to laws falling within a state's Twenty-first Amendment powers). If this is the case, Plaintiffs lose.

26

Assuming that's *not* the case, and that *Pike* balancing applies, Plaintiffs are very unlikely to succeed on the merits of their Dormant Commerce Clause claim. The "local benefits" in terms of crime reduction, etc. are unlikely to be so *clearly* dwarfed by the burden on interstate commerce stemming from reduced tourism that Plaintiffs would be able to prevail. Like most laws analyzed under the *Pike* test, the Spring Break Ordinances would almost certainly survive. *See Dep't of Revenue v. Davis*, 553 U.S. 328, 339 (2008) ("State laws frequently survive . . . *Pike* scrutiny").

## C. Equal Protection

Plaintiffs' Equal Protection claim is their most meritorious claim. The claim is laid out fairly succinctly in the First Amended Complaint:

> "201. From the late 1990s when Spring Break first became widely popular in Panama City Beach, to 2013, the attendees at Spring Break were overwhelmingly Caucasian or, as described by the City, 'the good kids' or the 'northern kids.'
>
> 202. Beginning in 2014, African Americans, described in the City as the 'thugs,' began to participate in Spring Break in larger numbers.
>
> 203. Also in 2014, Fox News began to cover Spring Break as a 'news' story.

204. Fox News' coverage focused disproportionately on the incidents that occurred at Spring Break and very disproportionately on the participation of African Americans in these incidents.

205. This coverage created a race-based animus against Spring Break and its African American participants.

206. This race-based animus manifested itself in the [Spring Break Ordinances,] which are designed to deny public accommodations to African Americans, including Plaintiffs JOHN DOE I and JANE DOE I because of their race."

ECF No. 16, at 45 ¶¶ 201–06.

### 1. Legal Standard

"[T]he appropriate legal framework for claims that a facially neutral statute was enacted to further unlawful discrimination [is as follows]: such a law is unconstitutional if (1) 'discrimination was a substantial or motivating factor' in the government's enactment of the law, and (2) the government cannot rebut that claim by showing 'that the provision would have been enacted in the absence of any racially discriminatory motive.'" *Young Apts., Inc. v. Town of Jupiter*, 529 F.3d 1027, 1045 (11th Cir. 2008) (quoting *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005)

(en banc)). For purposes of these preliminary injunction proceed-ings, this framework dictates that Plaintiffs must show that they are substantially likely to succeed in proving that race-based ani-mus was a motivating factor behind passing the ordinances, at which point the burden shifts to the City to show that it is substan-tially likely to succeed on its affirmative defense. *See Gonzales v. O Centro Espírita Beneficente Uniã do Vegetal*, 546 U.S. 418, 428–30 (2006) (holding in a case concerning RFRA that "the burdens at the preliminary injunction stage track the burdens at trial"); *see also LSSi Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1123 n.11 (11th Cir. 2012) (applying *Gonzales* in a case involving the Communications Act of 1934).

In addition to showing that the City enacted the Spring Break ordinances due to race-based animus, Plaintiffs must show that they are substantially likely to prove that there is a causal connection between that ordinance and some discriminatory im-pact. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344 n.18 (11th Cir. 2000).

2.      *Methods of Showing Discriminatory Intent*

There are more or less two paths Plaintiffs can proceed along in trying to show that the City was motivated by race-based animus in adopting the Spring Break Ordinances. First, and most obviously, Plaintiffs can try to show that the members of the City Council were themselves motivated by race-based animus. Plaintiffs will need to show that a majority of the members of the Council who voted in favor of the ordinances were motivated by such animus. *See Dixon v. Burke Cnty.*, 303 F.3d 1271, 1276 (11th Cir. 2002); *see also Mason v. Vill. of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001).

The second path involves showing that the City Council was influenced by others who themselves harbored discriminatory animus. For instance, Plaintiffs may be able to show that the City Council "acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the [City Council] were aware of the motivations of the private citizens." *Hallmark Developers, Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1284 (11th Cir. 2006). Or perhaps Plaintiffs can show that the "a biased subordinate who lacks decision-making power use[d] the City Council as

a dupe in a deliberate scheme to trigger . . . discriminatory . . .
action." *See Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th
Cir. 2014) (citations and quotations omitted).[11]

Underlying both of these paths is the requirement that
Plaintiffs show a causal connection between racial animus and the
passage of the ordinances—it is not enough for Plaintiffs to point
out that racism was "in the air" during City Council meetings, or
that certain non-decisionmaker Panama City Beach or Bay County
officials may have harbored racist attitudes.

### 3.     *Motivating Factor*

The City argues that "there is no evidence from which the
trier of fact could conclude that the City was motivated by racial
animus in passing the challenged ordinances." ECF No. 52, at 7.
Plaintiffs, on the other hand, argue that "the City of Panama City
Beach *clearly* showed racial animus against African Americans in
the promulgation and adoption of the Spring Break Ordinances."
ECF No. 21, at 16 (emphasis added). Each party overstates its
case. The stench of racism is unmistakable in the record, but it's

---

[11] It is unclear whether a "cat's-paw" theory of this nature is available
in an action seeking prospective injunctive relief against a municipal corpora-
tion.

not so rank that Plaintiffs have demonstrated a substantial likelihood of proving that race-based animus was a motivating factor behind the Spring Break Ordinances.

We'll begin with the members of the City Council. Each City Councilor claims in his or her affidavit that the decisions to approve the ordinances were not motivated by race. ECF Nos. 49-37, 49-38, 49-39, 49-40, & 49-41.[12] The rest of the record tells a slightly more complicated story. At least three members of the City Council (Councilman Reichard, Mayor Oberst, and Councilman Curry) made multiple statements during the year-and-a-half long time-frame of relevance to this case that could plausibly be construed as evincing some degree of racial animus. One of Plaintiffs' experts lists some of these statements in her report, *see* ECF No. 54-3, at 5–13, but there are actually more instances in the record. *See, e.g.*, ECF No. 49-13, at 9.

Sheriff McKeithen also allegedly made many statements that could be construed as evincing a race-based animus. *See, e.g.*, ECF No. 59-6, at 2–3. Chief Whitman did as well. *See, e.g.*, ECF No. 49-11, at 4.

---

[12] Such self-serving statements in affidavits are a wonderful reminder of why depositions—which Plaintiffs didn't take—exist.

Finally, the minutes of the City Council meetings are chock-full of citizens commenting on the problem of "thugs, "predators," "100-milers," etc. *See, e.g.*, ECF No. 49-3, at 6–15; ECF No. 49-13, at 6–8.

Most of these speakers—the City Councilors, the Sheriff, and most citizens—divided Spring Break visitors into two groups: the "good kids" and the "uninvited guests" or "100-milers." There seems to have been a common perception that the main source of the problem was those who came to "prey" on the "good kids," and that the ordinances should be tailored to keep out those people. *See, e.g.*, ECF No. 49-13, at 5–9. The degree of racial animus that can be attributed to the relevant actors in this case turns in large part on what should be made of the terms "100-miler," "predator," "thug" and the like. Plaintiffs of course argue that these terms are all "code words" concealing racial animus, and offer an expert opinion in support of that argument. ECF No. 54-3. The City argues that these terms refer to criminals and don't have any racial undertones. ECF No. 50, at 19.

"Drawing the line between facially race-neutral statements and racially charged code words is difficult." *Lloyd v. Holder*, No. 11 Civ. 3154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013).

"[C]ertain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness—words like 'welfare queen,' 'terrorist,' 'thug,' 'illegal alien.'" *Id.* Whether one of these terms evinces racial animus "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006 (per curiam).

In this case, while it is clear from the context that *some* speakers at *some* times were using the terms "100-miler" and "predator" and the like in a way that suggests racial animus, it is by no means clear that every relevant utterance—or even *most* relevant utterances—of these terms was suffused with racial undertones. These terms are all ambiguous and not necessarily racist, and Plaintiffs have not done enough to show why they should consistently be construed as racist in the context(s) in which they were spoken.

This is particularly true for the terms "100-miler" and "200-miler," which Plaintiffs claim refer to "African American visitors to Spring Break . . . who came to Panama City Beach from colleges and universities located within 100 miles or 200 miles of Panama City Beach, or non-students from the same area." ECF No. 16, at

14–15 ¶ 60. This definition is in some tension with the record, which seems to suggest that most members of the community thought of "100-milers" and "200-milers" as non-college students. It is not clear at all based on the record as it stands that Plaintiffs will be able to show that these terms—which were some of the most commonly-used "code words" at City Council meetings—always meant what Plaintiffs claim they always mean.

When pressed at the hearing for what evidence supports the definitions of "100-miler" and "200-miler" being advanced by Plaintiffs, Plaintiffs' counsel responded that he "did not think that it was even an issue," and that "the term 100-miler was a racial slur, accepted by custom and practice in the community." Counsel also stated that he "didn't think it was an issue that needed proof" and was perhaps even subject to judicial notice. It may turn out to be true that these terms are in fact clearly racial slurs, but this Court cannot just take Plaintiffs' word for it, nor will it take judicial notice without the proper requisites. *See* Fed. R. Civ. P. 201.

This ambiguity in the meaning of the terms "100-miler," etc. makes it difficult for Plaintiffs to show that race-based animus was a motivating factor using any of the theories discussed *supra* Part III.C.2. Plaintiffs are not likely to show that a majority of the City

Council was motivated by racial animus, nor are they likely to show that the City Council was aware of the citizenry's racial animus. The only important actor whose alleged comments seem to clearly harbor racial animus is Sheriff McKeithen, and there's little, if any evidence, that he played a determinative role in influencing the City Council's decision to adopt the ordinances. In fact, the City Council initially *rejected* Sheriff McKeithen's proposal to ban drinking on the beach in 2014, ECF No. 49-3, at 9, and then rejected it *again* at the first emergency meeting following the shooting[13] in 2015, ECF No. 49-10, at 6.

It is a close question, but ultimately Plaintiffs have not established a substantial likelihood of success on their claim that race was a motivating factor in passing the Spring Break Ordinances. Were Plaintiffs able to remove some of the ambiguities in the terms used by the City Councilors and other officials and the public, they would have a much stronger case. It's entirely possible

---

[13] On March 28, 2015, seven people were wounded in a shooting in Panama City Beach. *See* Emily Shapiro, *7 Injured, 3 Critically, in Panama City Beach Spring Break Shooting*, ABCNews.go.com (Mar. 29, 2015), http://abcnews.go.com/US/injured-critically-panama-city-beach-shooting/story?id=29974951.

that Plaintiffs will be able, using the tools of civil discovery, to compile a convincing body of evidence to support their story—possible, but not substantially likely.[14]

### 4.     *The City's Affirmative Defense*

Even assuming that Plaintiffs had established a substantial likelihood of success on their claim that race was a motivating factor in passing the Spring Break Ordinances, they would not be able to establish a substantial likelihood of success on their overall Equal Protection claim. Whatever the racial under (or over-) tones of the terms "predator," "thug," etc., they also all clearly refer to one who is engaging in criminal (or at least anti-social) behavior. This is true in the abstract,[15] but it's even more true in the context

---

[14] Plaintiffs focus much energy on the 2014 and 2015 Fox News coverage of Spring Break in Panama City Beach. The Fox News coverage was almost certainly a catalyst for the increased public interest in making changes to Spring Break starting in 2014, but it is far from clear that the coverage—even taking into account the numerous mentions of the "hundred mile club"—was "predominantly focused" on African-Americans. While there may be some merit to Plaintiffs' claim that the Fox News coverage served to stoke racial animus against African-Americans, the more compelling story (at least based on this record) is that the coverage embarrassed City officials and citizens.

[15] "Thug" is defined as "a violent criminal" or "a brutal ruffian or assassin." *Thug*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/thug (last visited Jan. 24, 2016). "Predator" is defined as "a person who looks for other people in order to use, control, or harm them in some way." *Predator*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/predator (last visited Jan. 24, 2016).

of this case—citizens, City Council members, etc. consistently referred to 100-milers, thugs, etc. *in connection with* criminal activity. And that criminal activity was actually occurring; the record is full of evidence that crime in Panama City Beach was relatively high during Spring Break in 2014 and 2015 (relative to the rest of the year), ECF No. 49-33, at 1–3, and of course the shooting in 2015 was one of the most obvious catalysts behind some of the ordinances, ECF No. 49-10.

All of this suggests that even if the ordinances were passed in part based on race-based animus, the chief concern of the City Council (and most everybody else who supported the ordinances) was in deterring crime and keeping out criminals. The City Council may have been more motivated to act because of a (possibly mistaken) animus-driven belief that those criminals were African-American; or it may have perceived the threat as being greater than it really was because of race-based animus; but it is difficult to believe that it would not have passed the ordinances even in the absence of any animus. Following two years of news coverage that cast the City in a bad light and a year that saw a horrible shooting incident and a widely publicized sexual assault that took place in

broad daylight on the beach, the City would likely have acted in the same manner regardless of any race-based animus.[16]

Even if Plaintiffs were able to show that race-based animus was a motivating factor behind the adoption of the ordinances, the City would be substantially likely to succeed in mounting its affirmative defense. Plaintiffs are thus not likely to succeed on their Equal Protection claim.

### D. Land Use/Zoning

Plaintiffs challenge the beach-drinking ordinance under various state and local laws relating to zoning and land-use planning. ECF No. 16, at 54–62 (Counts XI–XIV). At the preliminary injunction hearing, both parties agreed—as they also do in their papers— that all of these claims turn on the question of whether the beach-drinking ordinance is a "zoning ordinance" or a "land development regulation" under Florida law, or whether it is instead a general ordinance. All parties further agreed that if it is a general regulatory ordinance, Plaintiffs lose on these counts.

---

[16] Put another way: the City is substantially likely to succeed in showing that the City Council, even if it had African-Americans in mind when passing the Spring Break Ordinances, had African-American *criminals* in mind, and that it was the *criminal* nature of the "100-milers" rather than their race that caused the City Council to pass the ordinances.

All of Plaintiffs' land-use-related claims rely on the premise that the beach-drinking ordinance is a zoning or land-use regulation. The procedures of § 166.041, Florida Statutes (which the City concededly did not follow) only apply to "[o]rdinances that change the actual list of permitted, conditional, or prohibited uses within a zoning category, or ordinances . . . that change the actual zoning map designation of a parcel . . . of land." § 166.041(3)(c), Fla. Stat. (2015). The procedures of § 163.3194 (which, again, the City did not follow) only apply to "land development regulations" and "land developments codes." § 163.3194(2), Fla. Stat. (2015). The question, then, is whether the beach-drinking ordinance "change[s] the actual list of permitted, conditional, or prohibited uses within a zoning category" or is a "land development regulation."

### 1.    Changing the List of Uses

The beach-drinking ordinance does not on its face change the actual list of permitted, conditional, or prohibited uses within any zoning category. Still, any ordinance that "substantially affect[s] the use of land" must comply with the procedural requirements of § 166.041(3)(c). *Webb v. Town Council of Town of Hilliard*, 766 So.

2d 1241, 1244 (Fla. 1st DCA 2000) (per curiam).[17] The parties vigorously dispute whether the beach-drinking ordinance "substantially affects the use of land."

Plaintiffs rely largely on *Daytona Leisure Corp. v. City of Daytona Beach*, 539 So. 2d 597 (Fla. 5th DCA 1989). That case involved an emergency zoning ordinance that deprived a business of its ability to sell alcohol by instituting a "buffer zone" requirement for establishments selling alcoholic beverages. *Daytona Leisure Corp.*, 539 So. 2d at 598–99. The court held that the ordinance "substantially changes the permitted use of [the business's] property: it prohibits the sale or dispensing of alcoholic beverages for consumption on the premises, which previously was permitted."

---

[17] In 1995, the Florida Legislature changed the operative language of § 166.041(3)(c) in a way that would seem to be relevant to the analysis. The old version of the statute—the version considered in many of the cases cited by both sides in this case—required special procedures to be used for "[o]rdinances . . . which rezone specific parcels of private real property or which substantially change permitted use categories in zoning districts." *See* Ch. 95-310, Laws of Fla. After 1995 (and still today), an ordinance must "change the *actual* list of . . . uses within a zoning category" (emphasis added), which suggests that a reviewing court need only look to see whether an ordinance has *actually* changed the list of permissible uses in a zoning category rather than engage in the exercise of determining the extent of an ordinance's effect on those uses.

Because there is little, if any, published case law on this point, and because the parties agree that the "substantially affects the use of land" standard is the legal standard to be used, and because use of that standard does not lead to a different result than would be obtained were this Court to simply look at the list of land uses in each zoning category, this Court will use the "substantially affects the use of land" test.

*Id.* at 599. Plaintiffs claim that this case is "indistinguishable from the instant case." ECF No. 55, at 11.

The City, in turn, relies on a number of cases, the two most helpful of which are *M&A Management Corp. v. City of Melbourne*, 653 So. 2d 1050 (Fla. 5th DCA 1995), and *Lee County v. Lippi*, 693 So. 2d 686 (Fla. 2d DCA 1997). *M&A Management* involved a city ordinance prohibiting the use of any structure "for the conduct of Bingo Games more than two days per week." 653 So. 2d at 1050. The court held that this was a regulatory ordinance for a number of reasons: the ordinance "applie[d] to all properties in which bingo halls [we]re a permitted or a conditional use, not just property" in a particular zoning category; the ordinance did not change the use categories of the zoning use district covering the plaintiff's property; and "any restrictions of [the] [p]laintiff's use of its property result[ed] from the nature of the [regulated] conduct itself, not from the location of [the] property." *Id.* at 1051. The court went on to distinguish *Daytona Leisure*, noting that the ordinance at issue in that case "prohibited a property owner from selling alcoholic beverages for on-premises consumption because of the location of his property, not because of the nature of the conduct itself." *Id.* at 1052.

42

The beach-drinking ordinance is certainly closer to the *M&A Management* ordinance than the *Daytona Leisure* ordinance for two independent reasons. First, like the *M&A Management* ordinance, the beach-drinking ordinance directly regulates conduct, which in turn arguably impacts the use of land. The *Daytona Leisure* ordinance, in contrast, barred certain types of businesses from being within 200 feet of certain types of residences. *See Daytona Leisure*, 539 So. 2d at 598 n.1. True, the practical effect of this ordinance would have been to force the plaintiff not to serve alcohol, but the ordinance was still clearly one that dealt with what types of businesses could be located where—the essence of zoning. The beach-drinking ordinance, in contrast, says nothing about where a certain class of businesses may be located, and, like the *M&A Management* ordinance, cuts across use zoning districts, ECF No. 39, at 7.

Second, the beach-drinking ordinance, unlike the *Daytona Leisure* ordinance, does not directly impact the *sale* of alcohol, nor does it completely prohibit Plaintiffs from using their property in March the same way they use their property the rest of the year. The impairment of Plaintiffs' use of their land is nowhere near as

"substantial" as it was in *Daytona Leisure*. The effect is, instead, incidental.

It is true that the beach-drinking ordinance, unlike the ordinance in *M&A Management*, doesn't apply evenly throughout the jurisdiction, but is instead confined in its application to a particular geographic area. That doesn't take it outside the realm of regulatory ordinances—as evidenced by *Lee County v. Lippi*, an ordinance may be limited in its geographic scope without becoming a zoning ordinance. *Lippi* involved a challenge to two sections of a putative regulatory ordinance passed by Lee County. 693 So. 2d at 687. One section banned the use of personal watercraft in certain areas, while the other established certain requirements for personal watercraft rental facilities. *Id.* Those requirements included, *inter alia*, that "[t]he operations office [for the rental business] shall be located at a land-based site; and [t]he land-based site shall have direct access to the beach. Direct access shall not include public rights-of-way, County-owned beach access, or any residentially-zoned land that must be traversed to gain beach access." *Id.* at 688. The court held that the section of the ordinance setting up requirements for personal watercraft rental businesses was indeed a "land development regulation" that triggered the review requirements of

44

§ 163.3194, Florida Statutes. *Id.* at 689. The court held that the other section—banning the use of personal watercraft in certain areas—was "patently a regulatory ordinance." *Id.*

It should be clear that the beach-drinking ordinance is much closer to the portion of the ordinance upheld in *Lippi* than the portion deemed a "land regulation ordinance" and struck down. Again, the beach-drinking ordinance directly regulates conduct and cuts across use zoning classifications; that it also happens to only apply in a limited geographic area does not make it a zoning ordinance in disguise. Simply put, the beach-drinking ordinance does not "substantially affect" the use of Plaintiffs' land. Plaintiffs are therefore unlikely to succeed on the merits of their claim brought in Count XI.[18]

---

[18] This is not to say that an ordinance that directly regulates conduct rather than (as in *Daytona Leisure*) regulating where businesses that host that conduct can be located can never be a zoning ordinance. Much of the analysis has to do with intent—did the legislative body pass a law of general applicability that happens to impact some entities more than others, or did it, through the guise of a regulatory ordinance governing conduct, target a particular business or class of businesses in a way that is properly handled using the more stringent procedural requirements of land-use planning and zoning? This case is undoubtedly in the former category, and *Daytona Leisure* in the latter.

## 2.      *Land Regulation Ordinance*

Technically, the definition of "land development regulation" relevant to this case[19] is not identical to the definition of an ordinance that triggers the procedures of § 166.041(3)(c). The parties seem to agree, however, that the two are in reality one and the same. ECF No. 57, at 14; ECF No. 39, at 1–2. This seems to be right, as Florida courts consistently discuss the "substantially affects" standard in the context of "land development regulations." *See, e.g.*, *Galaxy Fireworks, Inc. v. City of Orlando*, 842 So. 2d 160, 164–66 (Fla. 5th DCA 2003). Given that the beach-drinking ordinance doesn't substantially affect the use of Plaintiffs' land, it's also not a land development regulation. Plaintiffs are unlikely to succeed on the merits of their claims brought in Counts XII–XIV.

## 3.      *The "Zoning Sign-Off" Issue*

There is one final argument to address in relation to Counts XI–XIV. Plaintiffs make much of the fact that the City has struggled to come up with a way to deal with a certain form that it must sign off on in order for Plaintiffs to be able to obtain an "extension

---

[19] "'Land development regulations' means ordinances enacted by governing bodies for the regulation of any aspect of development and includes any local government zoning, rezoning, subdivision, building construction, or sign regulations or any other regulations controlling the development of land." § 163.3164(26), Fla. Stat. (2015).

of premises" from the Florida Division of Alcoholic Beverages and Tobacco ("DABT"). ECF No. 57, at 14. The form asks the "zoning authority" to confirm that "[t]he location complies with zoning requirements for the sale of alcoholic beverages." ECF No. 56-3, at 10. Plaintiffs claim that "[i]f a zoning sign-off is required, then, per force, the regulation being applied, which is essentially the *removal* of this 'zoning sign off,' must be, *per se*, a zoning regulation." ECF No. 57, at 14.

In short, no. The form does not demonstrate that the beach-drinking ordinance is a zoning ordinance; it demonstrates that DABT didn't contemplate a situation quite like this one when drawing up its "extension of premises" form.

## IV.  IRREPARABLE HARM, ETC.

Because Plaintiffs are not substantially likely to succeed on any of their claims, there is no need to address the three remaining preliminary injunction factors.

## V.  CONCLUSION

Although Plaintiffs' claims are not without merit, they are not substantially likely to succeed on the merits of *any* of those

claims and are thus not entitled to a preliminary injunction.

Accordingly,

**IT IS ORDERED:**

Plaintiffs' Motion for a Preliminary Injunction, ECF No.

21, is **DENIED**.

**SO ORDERED on January 28, 2016.**

<u>**s/Mark E. Walker**</u>
**United States District Judge**